**SWIFF–TRAIN COMPANY, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 31002.**

United States Court of Appeals, Fifth Circuit.

June 11, 1971.

See also D.C., 314 F.Supp. 665.

Seagal V. Wheatley, U. S. Atty., San Antonio, Tex., Morton Hollander, William D. Appler, Attys., Dept. of Justice, Washington, D. C., L. Patrick Gray, III, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for defendant-appellant.

Jack A. Efron, San Antonio, Tex., Levey & Goldstein, San Antonio, Tex., for plaintiff-appellee.

Before TUTTLE, THORNBERRY and INGRAHAM, Circuit Judges.

TUTTLE, Circuit Judge:

The United States appeals from a judgment rendered against it in favor of Swiff-Train Company which brought the action under the Tucker Act alleging it was a third party beneficiary of a contract entered into between the Fort Sam Houston Guest House Fund and Midwest Carpet Distributors. It is clear that Swiff-Train furnished carpeting to the guest house and that payment was made contrary to the agreement between Midwest and the Fund.

The facts as stated in the government's brief, the statement of which is accepted by the appellee, are as follows:

"The Guest House Fund at Fort Sam Houston, Texas, is a non-appropriated fund activity organized to provide temporary accommodations for military personnel, their relatives and guests visiting the base or patients at Brooke General Army Hospital. Non-appropriated fund activities are unincor-

porated entities authorized by Army regulations to administer "moneys not appropriated by Congress for the benefit of military personnel or civilian employees" (AR–230–5, App. 8–9). Unlike the appropriated fund establishments of the Government, their operating expenses are not provided for by annual appropriation, and they are not required to return their operational receipts to the Treasury. In the case of the Guest House Fund, its sole revenue comes from service charges paid by the guests who use its facilities.

In September, 1968, the Guest House Fund entered into a contract with Bill R. May, doing business as Midwest Carpet Distributors, to carpet the rooms, stairs and hallways in the three buildings which comprise the Guest House, at a price of $11,200. That contract provided that the check for the carpeting be made payable jointly to the contractor and Swiff-Train Company, the supplier of the carpeting. The joint payment provision was included in the contract prepared by Midwest Carpet Distributors at the insistence of Swiff-Train Company, which otherwise would not have sold the carpeting to Midwest.

The carpeting was installed by November 26, and the Guest House Fund custodian had a check prepared jointly to Midwest and Swiff-Train, which was to be mailed to Midwest. However, before the check was put in the mail, the owner of Midwest called Lt. Russo and asked that he make the check solely payable to Midwest. The owner explained that he had sent checks out to Swiff-Train and the installers, and if possible he would like to have the check made out to him so that he could deposit it to cover the checks already written. The check was made out to Midwest and negotiated several days later.

On December 3, Swiff-Train advised Lt. Russo that it had not been paid. Lt. Russo attempted to have the check stopped but was advised by the bank where the Guest House Fund maintained its account that payment had already been made. Swiff-Train made efforts to recover the money due it from Midwest, whose owner had moved to California. When these efforts proved unsuccessful, this action was brought to obtain recovery from the United States."

The trial court, clearly feeling that it would be inequitable for the governmental agency to escape liability because of the failure of Lt. Russo to make the check payable in the manner that would protect the supplier of the merchandise, equated the waiver of immunity by the United States in the Tort Claims Act, 28 USCA 1346(b), with the waiver of immunity in the Tucker Act.[1] In doing so, the court recognized that the great weight of authority, principally in the court of claims, was contrary to its determination. The trial court attributed this line of decisions to what it felt was an "incorrect" judgment by the Court of Claims in Borden v. United States, 116 F.Supp. 873, 126 Ct.Cl. 902 (1953).

In the *Borden* case an accountant sued the United States for salary withheld from him on account of loss of payroll funds belonging to the Army Exchange Service, European Theatre, for which the United States claimed that Borden was responsible. It is clear that the Court of Claims, in declining to permit the suit to stand against the United States, placed considerable weight on the dictum by the United States Supreme Court in the case of Standard Oil Company of Cali-

---

1. This Act, which is codified as USCA § 1346(a) (2) read as follows at the time of the filing of the complaint:

"(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

fornia v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611, dealing with an entirely different subject. There was there involved the right of the state of California to tax the facilities of an Army post exchange. The court held that the post exchange was an arm of the United States Government and was exempt from taxation. However, in discussing the nature of a post exchange, similar, to the extent of being a non-appropriated fund, to the guest house fund which made the contract with which we are here involved, the court used the following language: 116 F.Supp. 876:

> "The commanding officer of an Army Post, subject to the regulations and the commands of his own superior officers, has complete authority to establish and maintain an exchange. He details a post exchange officer to manage its affairs. This officer and the commanding officers of the various company units make up a council which supervises exchange activities. None of these officers receives any compensation other than his regular salary. The object of the exchanges is to provide convenient and reliable sources where soldiers can obtain their ordinary needs at the lowest possible prices. Soldiers, their families, and civilians employed on military posts here and abroad can buy at exchanges. *The Government assumes none of the financial obligations of the exchange.* But government officers, under government regulations, handle and are responsible for all funds of the exchange which are obtained from the companies or detachments composing its membership. Profits, if any, do not go to individuals. They are used to improve the soldiers' mess, to provide various types of recreation, and in general to add to the pleasure and comfort of the troops." (Emphasis supplied.)

However, the Court of Claims also cited Edelstein v. South Post Officers Club, 118 F.Supp. 40, a case from the Eastern District of Virginia, and Kyle v. United States, 46 Ct.Cl. 197, a case which ante-dated the Standard Oil case decided by the Supreme Court. The court also referred to Bleuer v. United States, 117 F.Supp. 509 in which the District Court for the Eastern District of South Carolina held that the plaintiff could not sue the United States for the breach of an employment contract he had made with an "open mess", a non-appropriated fund of the Marine Corps.

The only appellate court decision which appears to be precisely in point is Jaeger v. United States, 1968, 129 U.S.App.D.C. 319, 394 F.2d 944. In that case, in a suit for contractual bailment the court cited all of the decisions referred to above. The court said: "The United States has not consented to suit on this contract even if it is implied in fact. Open Messes are established pursuant to regulations issued by the Secretary of the Army [footnote 3, citing A.R. 230–60]. They are non-appropriated funds activities, generally controlled by the provisions of A.R. 230–5. As these activities, like post exchanges, are not operated with United States funds, the regulations provide that the United States shall not be liable for their contracts. (Footnote omitted.) These regulations have consistently been upheld. Although non-appropriated funds activities are instrumentalities of the United States (fn. citing Standard Oil Company of California v. Johnson, supra.), suit will not lie against the United States to enforce their contractual obligations."

It is clear that the Supreme Court did not hold in the Standard Oil case that breach of contracts with non-appropriated funds did not give rise to a cause of action against the United States because of sovereign immunity. However, as stated by the court in Pulaski Cab Company v. United States, 157 F.Supp. 955, 141 Ct.Cl. 160 (1958), while the Supreme Court's decision "may not be a definitive holding that the Government is not liable for the debts of the Exchange, * * * it points in that direction."

If any doubt existed as to the understanding of the Congress touching on the

question of government immunity from suits against such non-appropriated activities as post exchanges, open messes, guest houses and the like, this doubt was fully resolved by action taken in the 91st Congress when, for the first time, Congress expressly amended the Tucker Act in order to bind the United States on contracts made with all service post exchanges so that the Tucker Act now provides expressly as follows: "For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States," 28 USCA 1346(a) (2) as amended.

Legislative history of this action in the 91st Congress makes it plain that other non-appropriated funds, such as open messes and the guest house here involved, were not to be included along with the exchanges as to withdrawal of sovereign immunity.

A proposed amendment to the Tucker Act introduced in the Senate would have added the following sentence. "For the purpose of this paragraph, an express or implied contract with a non-appropriated fund activity of or under the United States or a department or agency of the United States shall be considered an express or implied contract with the United States." Sen.Rep. #268, 91st Congress, First Sess., pg. 16. The bill as proposed in S. 980 was passed by the Senate. However, the House Judiciary Committee amended this bill to limit the waiver of sovereign immunity to only those contracts made by post exchanges, because as stated in its report, "the complete removal of sovereign immunity for *all* (emphasis in original) non-appropriated fund activities would be undesirable * * *." H.Rep. 933, 91st Congress Second Sess., pg. 2, U.S.Code Cong. & Admin.News 1970, p. 3479. The House Committee amended S. 980 to limit the

waiver of sovereign immunity to only those contracts made by post exchanges. One of the reasons given for the committee's report that the complete removal of sovereign immunity for *all* non-appropriated fund activities was that, whereas post exchanges are so operated as to have funds available to discharge all liabilities, "since not every non-appropriated fund activities has sufficient assets to reimburse the United States, the cost of the judgment in some cases would be imposed on the tax payer—a result which is inconsistent with the very concept of non-appropriated fund activities." The House accepted the version of its own committee and the bill passed in the amended form. The Senate accepted the House version. P.L. 91–350, 84 Stat. 449 was then signed into law on July 23rd, 1970.

If the Court of Claims, the many district courts and the Court of Appeals for the District Court improperly based their decisions as to the non-suability of the United States for contract liabilities of officers, open messes and guest houses and the like by following the dictum of the Supreme Court in the *Standard Oil* case, it can nevertheless be said that Congress has demonstrated not only that it felt it necessary to pass a statute expressly authorizing suits against post exchanges, but that it had every intention not to expand such authorization to other non-appropriated funds.

The statute just referred to, and the clearly expressed Congressional intent, were not available to the trial court at the time of its decision, because the amendment was passed later. We are satisfied that had this congressional expression been available to the trial court it would have decided differently with respect to the claim in issue.

In any event, we are compelled under the authorities and in light of the congressional intent to reverse the judgment of the trial court.

The judgment is Reversed and the case is Remanded to the trial court for the purpose of dismissing the complaint.